IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
Record No. 14-4370

_____

UNITED STATES OF AMERICA
                    Plaintiff-Appellee,


v.


ALEJANDRO GARCIA-LAGUNAS,
                    Defendant-Appellant.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT WILMINGTON
_____

APPELLANT'S OPENING BRIEF
_____


Paul K. Sun, Jr.
Ellis & Winters LLP
Post Office Box 33550
Raleigh, North Carolina 27636
(919) 865-7000

## TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     I.     WHETHER THE ADMISSION OF EVIDENCE AND ARGUMENT REGARDING "HISPANIC DRUG TRAFFICKERS" DENIED MR. GARCIA-LAGUNAS HIS DUE PROCESS AND EQUAL PROTECTION RIGHTS AND CONSTITUTES REVERSIBLE ERROR?

     II.    WHETHER THE GOVERNMENT'S ATTACK ON MR. GARCIA-LAGUNAS'S CHARACTER BASED ON HIS IMMIGRATION STATUS AND USE OF A SPANISH INTERPRETER VIOLATED MR. GARCIA-LAGUNAS'S RIGHT TO A FAIR TRIAL?

     III.   WHETHER THE ERRONEOUS ADMISSION OF EXPERT AND LAY OPINION TESTIMONY WAS PREJUDICIAL ERROR?

     IV.   WHETHER THE DISTRICT COURT'S SENTENCING ERRORS REQUIRE A REMAND FOR RESENTENCING?

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     I.     MR. GARCIA-LAGUNAS IS ENTITLED TO A NEW TRIAL WHERE THE GOVERNMENT'S RELIANCE ON RACE-BASED OPINION TESTIMONY TO PROVE CULPABLE CONDUCT DEPRIVED MR. GARCIA-LAGUNAS HIS DUE PROCESS AND

EQUAL PROTECTION RIGHTS.. . . . . . . . . . . . . . . . . . . . . . . . . 25

*Standard of Review*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Discussion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      A.    The District Court Erroneously Admitted Evidence Of A
            Racial Stereotype And Argument Based On That
            Stereotype. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      B.    The District Court's Errors In Allowing Race-Based Evidence
            And Argument Warrant Reversal.. . . . . . . . . . . . . . . . . . . . 28

II.    THE DISTRICT COURT ERRED BY ADMITTING EVIDENCE
      THAT IMPUGNED MR. GARCIA-LAGUNAS'S CHARACTER
      BASED ON HIS IMMIGRATION STATUS AND HIS USE OF A
      SPANISH INTERPRETER AT TRIAL. . . . . . . . . . . . . . . . . . . . . . . 33

      *Standard of Review*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      *Discussion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

III.    THE DISTRICT COURT ERRED BY PERMITTING SPECIAL
      AGENT COLLINS TO TESTIFY AS AN EXPERT WITNESS
      WHERE THE GOVERNMENT FAILED TO COMPLY WITH THE
      EXPERT DISCLOSURE REQUIREMENTS. . . . . . . . . . . . . . . . . 36

      *Standard of Review*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      *Discussion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IV.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY
      ALLOWING IMPROPER OPINION TESTIMONY FROM FOUR
      GOVERNMENT WITNESSES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      *Standard of Review*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Discussion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    A.    The District Court Erred By Allowing Four Law Enforcement
        Officers To Give Opinions Based On Their Training and
        Experience. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    B.    The Improper Opinion Testimony Was Prejudicial. . . . . . . . . 43

V.    UNDER THE CUMULATIVE ERROR DOCTRINE, THE
    DISTRICT COURT'S MULTIPLE EVIDENTIARY ERRORS,
    CONSIDERED IN THE AGGREGATE, DENIED MR. GARCIA-
    LAGUNAS A FAIR TRIAL... . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

VI.    MR. GARCIA-LAGUNAS IS ENTITLED TO A NEW
    SENTENCING HEARING BASED ON THE DISTRICT COURT'S
    MULTIPLE ERRORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    A.    The District Court Denied Mr. Garcia-Lagunas The
        Opportunity To Address The Court Before His Sentence Was
        Imposed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    *Standard of Review*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    *Discussion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    B.    Mr. Garcia-Lagunas's Sentence Is Procedurally And
        Substantively Unreasonable.. . . . . . . . . . . . . . . . . . . . . . . . . . 48

    *Standard of Review*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    *Discussion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        1.    Mr. Garcia-Lagunas's Sentence Is Procedurally
            Unreasonable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

          a.      The district court used an incorrect Guidelines range.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

          b.      The district court failed to consider the § 3553(a) factors.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

     2.     Mr. Garcia-Lagunas's Sentence Is Substantively Unreasonable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

   C.    The District Court Committed A *Collins* Error By Failing To Ask The Jury To Find The Drug Quantity Attributable to Mr. Garcia-Lagunas.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

iv

<u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Batson v. Kentucky*, 476 U.S. 79 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Certain Underwriters at Lloyd's, London v. Sinkovich*,
    232 F.3d 200 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993).. . . . . . . . . . . . . . . 39

*Gall v. United States*, 552 U.S. 38 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . 48-49, 52

*Green v. United States*, 365 U.S. 301 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993 (9th Cir.),
    *amended on unrelated grounds*, 272 F.3d 1289 (9th Cir. 2001). . . . . . . . . 29

*Johnson v. California*, 543 U.S. 499 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Kotteakos v. United States*, 328 U.S. 750 (1946). . . . . . . . . . . . . . . . . . . . . . . . . 41

*McCleskey v. Kemp*, 481 U.S. 279 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*McFarland v. Smith*, 611 F.2d 414 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . 29, 30

*Mendoza v. United States*, 755 F.3d 821 (7th Cir. 2014). . . . . . . . . . . . . . . . . . . 33

*Miller v. North Carolina*, 583 F.2d 701 (4th Cir. 1978).. . . . . . . . . . . . . . . . 30, 32

*Montana v. Egelhoff*, 518 U.S. 37 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*Powers v. Ohio*, 499 U.S. 400 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Rose v. Mitchell*, 443 U.S. 545 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

*Rojas v. Richardson*, 703 F.2d 186 (5th Cir.), *rev'd en banc*,

713 F.2d 116 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Rush v. Smith*, 56 F.3d 918 (8th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Baker*, 445 F.3d 987 (7th Cir. 2006).. . . . . . . . . . . . . . . . . . . . 50

*United States v. Brooks*, 524 F.3d 549 (4th Cir. 2008).. . . . . . . . . . . . . . . . 21, 51

*United States v. Cabrera*, 222 F.3d 590 (9th Cir. 2000). . . . . . . . . . . . . . 26, 27, 33

*United States v. Carter*, 564 F.3d 325 (4th Cir. 2009). . . . . . . . . . . . . . . 48, 49, 51

*United States v. Cole*, 27 F.3d 996 (4th Cir. 1994).. . . . . . . . . . . . . . . . . . . 46, 47

*United States v. Collins*, 415 F.3d 304 (4th Cir. 2005). . . . . . . . . . . . . . 21, 51, 52

*United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . 29, 32

*United States v. Doe*, 903 F.2d 16 (D.C. Cir. 1990). . . . . . . . . . . . . 26, 27, 28, 32

*United States v. Dorsey*, 45 F.3d 809 (4th Cir.). . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Engle*, 592 F.3d 495 (4th Cir. 2010).. . . . . . . . . . . . . . . . . . . . 50

*United States v. Foster*, 507 F.3d 233 (4th Cir. 2007). . . . . . . . . . . . . . . . . . . . 51

*United States v. Garcia*, 752 F.3d 382 (4th Cir. 2014).. . . . . . . . . . . . . . . . . . . 42

*United States v. Gaskill*, 318 F. App'x 251 (4th Cir. 2009). . . . . . . . . . . . . . . . 49

*United States v. Grandison*, 783 F.2d 1152 (4th Cir. 1986).. . . . . . . . . . . . . . . 31

*United States v. Hedgepeth*, 418 F.3d 411 (4th Cir. 2005).. . . . . . . . . 25, 28, 39, 43

*United States v. Johnson*, 617 F. 3d 286 (4th Cir. 2010) .. . . . . . . 25, 37, 38, 39, 40

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Lynn*, 592 F.3d 572 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Odom*, 736 F.2d 104 (4th Cir. 1984). . . . . . . . . . . . . . . . . . . . . 32

*United States v. Olano*, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Poindexter*, No. 95-5327, 1997 WL 577679
    (4th Cir. Sept. 18, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Martinez*, 277 F.3d 517 (4th Cir. 2002). . . . . . . . . . . . . . . . . . . 43

*United States v. McBride*, 676 F.3d 385 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . 35

*United States v. Montes-Flores*, 736 F.3d 357 (4th Cir. 2013). . . . . . . . . . . . . . 48

*United States v. Montes-Pineda*, 445 F.3d 375 (4th Cir. 2006). . . . . . . . . . . . . . 49

*United States v. Muhammad*, 478 F.3d 247 (4th Cir. 2007). . . . . . . . . . . . . . . . . 44

*United States v. Stacks*, 571 F. App'x 164 (4th Cir. 2014) . . . . . . . . . . . . . . . . . 38

*United States v. Rodriguez-Cortes*, 949 F.2d 532 (1st Cir. 1991). . . . . . . 26, 28, 30

*United States v. Vue*, 13 F.3d 1206 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . 26, 32

*United States v. Williams*, 740 F.3d 308 (4th Cir. 2014). . . . . . . . . . . . . . . . . . . 35

<u>STATUTES AND OTHER AUTHORITIES</u>

8 U.S.C. § 1325.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8 U.S.C. § 1326.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7

18 U.S.C. § 3231.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.SC. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 46, 48, 49, 50

21 U.S.C. § 841. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 51, 52

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

28 U.S.C. § 1291... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1827. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Fed. R. Crim. P. 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 34, 35, 36

Fed. R. Crim. P. 32. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Fed. R. Evid. 701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 40

Fed. R. Evid. 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 38

Fed. R. Evid. 703. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

Fed. R. Evid. 705. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. § 2D1.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

viii

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Alejandro Garcia-Lagunas was charged by indictment with conspiracy to distribute and possess with intent to distribute five hundred grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846; and illegal reentry into the United States, in violation of 8 U.S.C. § 1326(a).  J.A. 27-28.  The district court had subject matter jurisdiction under 18 U.S.C. § 3231.

Mr. Garcia-Lagunas pleaded guilty to violation of 8 U.S.C. § 1326(a), then proceeded to trial on the drug conspiracy charge.  J.A. 11.  After a three-day trial, the jury returned a guilty verdict on the drug conspiracy charge.  J.A. 571, 576.

The district court held a sentencing hearing on 29 April 2014 and entered a judgment sentencing Mr. Garcia-Lagunas to 188 months' imprisonment on the drug conspiracy charge, and 24 months' imprisonment, to run concurrently, on the illegal reentry charge.  J.A. 680-81.  Mr. Garcia-Lagunas timely filed a Notice of Appeal on 6 May 2014.  J.A. 692-93.  This Court has jurisdiction of this appeal from a final judgment under 28 U.S.C. § 1291.

1

## STATEMENT OF THE ISSUES

I.    WHETHER ADMISSION OF EVIDENCE AND ARGUMENT
      REGARDING "HISPANIC DRUG TRAFFICKERS" DENIED MR.
      GARCIA-LAGUNAS HIS DUE PROCESS AND EQUAL PROTECTION
      RIGHTS AND CONSTITUTES REVERSIBLE ERROR?

II.   WHETHER THE GOVERNMENT'S ATTACK ON MR. GARCIA-
      LAGUNAS'S CHARACTER BASED ON HIS IMMIGRATION STATUS
      AND USE OF A SPANISH INTERPRETER VIOLATED MR. GARCIA-
      LAGUNAS'S RIGHT TO A FAIR TRIAL?

III.  WHETHER THE ERRONEOUS ADMISSION OF EXPERT AND LAY
      OPINION TESTIMONY WAS PREJUDICIAL ERROR?

IV.   WHETHER THE DISTRICT COURT'S SENTENCING ERRORS
      REQUIRE A REMAND FOR RESENTENCING?

## STATEMENT OF THE CASE

*The police execute search warrants and arrest "Alex"*

Fayetteville, North Carolina, police investigating drug trafficking obtained information from several sources that a Mexican national named "Alex" was supplying cocaine.  J.A. 92.  On 28 March 2012, Fayetteville and Robeson County police simultaneously executed search warrants at a trailer located at 294 Maple Leaf Drive, St. Pauls, North Carolina; a trailer located at 33 Sonoma Street, Lumberton, North Carolina; and a trailer located at 47 Sonoma Street, Lumberton, North Carolina.  J.A. 99.

At 33 Sonoma Street, the police found two elderly residents, who are the parents of Alejandro Garcia-Lagunas.  J.A. 99, 241.  The police found no contraband inside the trailer.  J.A. 259.  They found mail addressed to Alex Fuentes at that location.  J.A. 259-60.

No one was present when the police executed the warrant at 47 Sonoma Street, which is directly adjacent to 33 Sonoma Street.  J.A. 99.  In a shed that contained lawn care equipment behind the trailer, the police found gallon-sized plastic bags, cellophane, and duct tape in the dirt and inside a lawnmower bag.  J.A. 98, 279-80.  White powder residue inside the bags field tested positive for

3

cocaine.  J.A. 98.

At 294 Maple Leaf Drive, the police found an older male who was carrying a user amount of cocaine.  J.A. 99.  They found no other contraband at that location.  J.A. 458.

Having executed the warrants without locating "Alex," the police gathered to consider their next steps.  J.A. 281.  The police had conducted surveillance for over a month at 294 Maple Leaf Drive before they executed the search warrant, and during that time had followed vehicles that had stopped at that location.  J.A. 281.  On one occasion a white truck left 294 Maple Leaf Drive with what appeared to be furniture in the back and proceeded to 353 Westcott Drive in St. Pauls.  J.A. 101, 281, 432.  The police decided to go to the Wescott Drive but did not have probable cause (or a warrant) to search that location.  J.A. 262, 281.  Two officers approached the front of the trailer at that location, heard noises inside the trailer, and observed a man walk away from the back of the trailer.  J.A. 281-82.  The police stopped the man, Marco Hernandez, and got his consent to enter and search the trailer.  J.A. 282.

Inside the trailer, the police found Mr. Garcia-Lagunas sitting at a table in the kitchen area with Brian Jacobs.  J.A. 103.  Mr. Garcia-Lagunas, who said his

4

name was Alex, was not wearing a shirt or shoes, and had apparently been

snorting cocaine—he had white powder under his nose, his pupils were dilated

and his speech slurred, and his mouth was jerking involuntarily. J.A. 248, 283,

288-89. The police found money and telephones on the table. J.A. 104. When the

police dialed the telephone number they said informants had provided for "Alex,"

a phone in Mr. Garcia-Lagunas's possession rang. J.A. 129. When the police

asked Mr. Garcia-Lagunas where his shirt and shoes were, he pointed to a

bedroom in the trailer. J.A. 174.

Searching the kitchen area, the police found a handgun inside a Crown

Royal bag in a cabinet above the stove. J.A. 105. On top of the refrigerator, the

police found small plastic ziplock bags. J.A. 125.

Marco Hernandez led the police through the trailer. J.A. 103. In a

bedroom, the police found a bulletproof vest on the floor. J.A. 105. There was a

digital scale on top of a dresser in that bedroom, and inside one of the dresser

drawers was a smaller digital scale. J.A. 252. Inside a plastic storage container

the police found what appeared to be a small amount of crack cocaine, and a larger

bag of white powder that field tested positive for cocaine. J.A. 107-09. The

police also found what appeared to be a small amount of crack in the pocket of a

5

jacket inside a closet in the bedroom.  J.A. 404.  The police did not find any items

with Mr. Garcia-Lagunas's or Alex Fuentes's name in the bedroom.  J.A. 265.  At

that time, Hernandez told the police that he had a roommate who left the items in

the bedroom and had returned to Mexico.  J.A. 265.

Mr. Garcia-Lagunas told the police that he did not live at the trailer at 353

Wescott.  J.A. 249.  He had an identification card that listed his address as 48

Sonoma Street.  J.A. 391.

*Pretrial Proceedings*

Mr. Garcia-Lagunas and Brian Jacobs were indicted for conspiring with

others beginning no later than March 2010 to distribute and possess with intent to

distribute five hundred grams or more of cocaine, in violation of 21 U.S.C. §§

841(a)(1), 846.  J.A. 27.  Mr. Garcia-Lagunas was also charged with illegal reentry

into the United States, in violation of 8 U.S.C. § 1326(a).  J.A. 28.  Marco

Hernandez was charged in the third count of the Indictment with illegal entry into

the United States, in violation of *id.* § 1325(a).  J.A. 28.

The court appointed counsel to represent Mr. Garcia-Lagunas.  J.A. 7.  The

court also provided a Spanish interpreter at all proceedings.  J.A. 1.

At his arraignment, Mr. Garcia-Lagunas pleaded guilty to violation of §

6

1326(a).  J.A. 11.  He pleaded not guilty to the conspiracy charge.  J.A. 11, 27.

The Government filed a Notice of Expert Witnesses that identified two experts, Patti Carroll and Shawn Collins.  J.A. 31-33.  As to Collins, the notice provided, in its entirety:

> Shawn Collins is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.  He will testify about drug trafficking investigations and methods utilized by drug traffickers to operate and protect their drug business.

J.A. 31-32.

The Government also filed two notices of intent to present Rule 404(b) evidence.  J.A. 34-36, 47-49.  In the first filing, the Government gave notice of its intent to introduce evidence of Mr. Garcia-Lagunas's possession of crack cocaine. J.A. 34.  The notice also stated that the Government intended "to introduce evidence the defendant was an alien illegally in this country at the time of the offense."  J.A. 34.  The notice recited that the identified evidence was relevant to an issue other than character, that it was probative of an element of an essential claim or element of the offense, that it was reliable, and that its probative value was not substantially outweighed by its prejudicial nature.  J.A. 34-35.

In the second Rule 404(b) notice, the Government indicated that it would present evidence that Mr. Garcia-Lagunas sold cocaine to Brian Jacobs beginning

7

in 2008 and continuing until his arrest on 28 March 2012. J.A. 47. The Government's justification for this 404(b) evidence was identical to its justification for the evidence described in the first notice. J.A. 47-48. The district court ruled that the evidence was admissible. J.A. 60.

Mr. Garcia-Lagunas filed two motions in limine prior to trial seeking to exclude evidence seized pursuant to the search warrants and at the time of his arrest. J.A. 11, 37-46. The district court denied the motions after argument before the start of trial. J.A. 53-59.

*The Government's expert witness*

Special Agent Shawn Collins was the Government's first witness. J.A. 80. Over the objection of Mr. Garcia-Lagunas's counsel, the court qualified Collins as an expert "in the field of narcotics investigations." J.A. 82. Collins then explained how a "typical drug deal" takes place. J.A. 82. According to Collins, the buyer and dealer usually communicate by telephone to arrange the drug quantity and the price, often using nicknames for the drugs. J.A. 82-83. Collins testified the dealer may change the location for the transaction in an attempt to avoid police detection. J.A. 85. Collins said that cocaine dealers use cellophane sandwich bags to sell a small quantity of the drug; dealers will use vacuum seal

8

plastic bags to hold kilogram or larger amounts of cocaine.  J.A. 86.

Collins was present when the search warrants were executed at the Sonoma Street trailers.  J.A. 94.  Collins said he observed "kilo wrappers" that were found inside the shed behind 47 Sonoma Street.  J.A. 94.  He described them as vacuum seal or food saver bags that he testified cocaine dealers commonly use to store kilogram quantities of cocaine.  J.A. 96-97.  Collins testified that the duct tape and cellophane were also consistent with drug packaging.  J.A. 96.  Collins opined that the residue in the bags was cocaine, and that it had field tested positive for cocaine.  J.A. 96-97.  He further opined that the materials were sufficient to package ten kilograms of cocaine.  J.A. 98-99.

Collins was also present for the search at 353 Wescott.  J.A. 101-02. Collins found the handgun inside the Crown Royal bag in the kitchen cabinet. J.A. 105.  He opined that the scales found in the bedroom were the kind used by drug dealers—the larger scale was the kind drug dealers use to weigh larger quantities of drugs, while the smaller size scale would be used to weigh gram quantities.  J.A. 105.  He characterized the bulletproof vest as another tool of the drug trade.  J.A. 106.

Collins testified that he and other officers field tested the white powder

9

found inside the plastic storage container and that it tested positive for cocaine with a "light reading." J.A. 107. Collins said that meant the powder was not pure cocaine, that it had "a lot of cut added to it." J.A. 108. Collins added that when the North Carolina State Bureau of Investigation ("SBI") laboratory tested the powder, it found no controlled substance. J.A. 109. When Collins attempted to offer an opinion why the SBI lab test showed no controlled substance, the district court initially sustained a defense objection. J.A. 109. But the Government elicited further testimony from Collins that, based on discussions with lab personnel, Collins believed they would have tested only a small quantity of the powder, and the court allowed Collins to offer the opinion that the lab test was negative for cocaine because cutting agent had been added. J.A. 111.

The Assistant United States Attorney ended his direct examination of Collins by asking about Mr. Garcia-Lagunas's immigration status. J.A. 150. Collins testified that Mr. Garcia-Lagunas was "an alien illegally in the United States." J.A. 150. The Government's attorney then called Collins's attention to the fact that Mr. Garcia-Lagunas was assisted by a Spanish interpreter at trial. J.A. 150. Collins said he did not need an interpreter to communicate with Mr. Garcia-Lagunas. J.A. 151. He said none of the drug dealers the police associated with

10

Mr. Garcia-Lagunas had reported any need to speak Spanish to conduct the drug deals.  J.A. 150-51.

*The drug dealers*

The Government presented testimony from four drug dealers who said they bought cocaine from Mr. Garcia-Lagunas:  Ronnie Reed, Antonio Locklear, Thomas Brewington, and co-defendant Brian Jacobs.

Reed was a Fayetteville drug dealer.  J.A. 90, 173.  At trial, he testified that a cocaine supplier he knew as "Alex" was Mr. Garcia-Lagunas.  J.A. 223.

Reed first came to the attention of Special Agent Collins after Fayetteville police arrested Reed on drug charges.  J.A. 90.  When Reed was arrested in 2011, the police seized more than $90,000 in proceeds from Reed's drug dealing.  J.A. 189.  The police found crack and three and a half kilos of powder cocaine.  J.A. 226.  The police also found and seized multiple firearms.  J.A. 226-28.  Reed agreed to forfeit five vehicles, including an Acura, a BMW, and a Lincoln Navigator as part of a plea deal.  J.A. 229.

The police had Reed under investigation and surveillance following his release on bond.  J.A. 155.  The police had seen Reed at the trailer at 294 Maple Leaf Drive.  J.A. 156.  The police never identified Mr. Garcia-Lagunas or saw

11

Reed meet with him during their surveillance of Reed.  J.A. 156.

The police arrested Reed again on 27 March 2012.  J.A. 188.  At that time, Reed agreed to cooperate and provided phone numbers for a cocaine supplier he called "Alex."  J.A. 209.  Special Agent Collins drove Reed to locations where Reed said he bought cocaine from Alex.  J.A. 219.  They went to 294 Maple Leaf Drive and also to Sonoma Street.  J.A. 70-71.  Reed testified at Mr. Garcia-Lagunas's trial pursuant to a plea agreement.  J.A. 210-11.

Reed testified he bought cocaine from Mr. Garcia-Lagunas beginning in October 2011 at the Sonoma Street location.  J.A. 190, 204.  Reed said he would call Mr. Garcia-Lagunas on the telephone and tell him how much he wanted to purchase.  J.A. 195.  During the six months he said he dealt with Mr. Garcia-Lagunas, Reed testified he bought cocaine twice a week and purchased a minimum of six kilograms of cocaine at that location.  J.A. 204-05.

Reed said he also bought cocaine once a week from Mr. Garcia-Lagunas at 294 Maple Leaf Drive beginning in December 2011.  J.A. 206.  Reed said that Mr. Garcia-Lagunas directed him to this location when Reed was buying a larger quantity of cocaine—nine ounces or more.  J.A. 206.  Reed said he paid $8700 for nine ounces (a quarter kilo), and $17,000 for eighteen ounces (a half kilo).  J.A.

12

214.  Reed estimated that he bought a minimum of four kilograms of cocaine from

Mr. Garcia-Lagunas at 294 Maple Leaf Drive.  J.A. 207-08.

Antonio Locklear was another Fayetteville drug dealer.  J.A. 398.  He

testified that he bought cocaine from Mr. Garcia-Lagunas every other day at the

Sonoma Street location from June 2010 until he was arrested in March 2011.  J.A.

387-88.  He bought nine to eighteen ounces of cocaine each time.  J.A. 387.  In

total Locklear said he bought twenty-nine to thirty kilograms of cocaine from Mr.

Garcia-Lagunas.  J.A. 388.  He testified at Mr. Garcia-Lagunas's trial pursuant to a

plea agreement.  J.A. 393.

Thomas Brewington also testified that he bought cocaine from Mr. Garcia-

Lagunas, whom he knew as Alex.  J.A. 357.  Brewington said he met Mr. Garcia-

Lagunas in February 2011 and bought nine ounces of cocaine from him in on one

occasion February 2012.  J.A. 357-60.  Brewington paid $8700 for the cocaine.

J.A. 360.  Brewington tried to cook the cocaine into crack, but he said the cocaine

had been cut and would not cook properly.  J.A. 363.

When the police arrested Brewington, he gave them a phone number for

"Alex" and took them to 294 Maple Leaf Drive where he said he bought the

cocaine.  J.A. 179, 365-66.  The phone number was the same as one that Reed

13

provided for his supplier.  J.A. 138.  Brewington testified at trial pursuant to a plea agreement.  J.A. 367.

Brian Jacobs, who was arrested with Mr. Garcia-Lagunas at 353 Wescott, testified that he was there to buy cocaine from Mr. Garcia-Lagunas.  J.A. 335-37, 344.  He testified that Mr. Garcia-Lagunas used to buy cocaine from him, but then Mr. Garcia-Lagunas became his supplier.  J.A. 330.  Jacobs said he bought cocaine from Mr. Garcia-Lagunas at Mr. Garcia-Lagunas's mother's house on Sonoma Street and at the trailer at 294 Maple Leaf Drive.  J.A. 332, 334.  He bought between one-quarter to three-quarters of an ounce of cocaine on these occasions.  J.A. 341.

Jacobs testified that Mr. Garcia-Lagunas had him come to Wescott Drive because the police had been to the trailer on Maple Leaf Drive.  J.A. 335.  He spoke to Mr. Garcia-Lagunas the day before and on the day they were arrested.  J.A. 338.  Mr. Garcia-Lagunas was using cocaine that day.  J.A. 349.  Jacobs said he paid Mr. Garcia-Lagunas $600 for three-quarters of an ounce of cocaine.  J.A. 342.  Jacobs denied having brought with him the handgun found in the kitchen cabinet.  J.A. 347.  He testified pursuant to a plea agreement.  J.A. 343.

The Assistant United States Attorney asked each of the drug dealers

14

whether he had spoken to Mr. Garcia-Lagunas in English.  Each said he had

spoken to Mr. Garcia-Lagunas in English.  J.A. 239 (Reed), 331 (Jacobs), 370

(Brewington), 391 (Locklear).  The Assistant United States Attorney asked

Brewington and Locklear specifically whether Mr. Garcia-Lagunas appeared to

have any difficulty communicating in English.  J.A. 371 (Brewington), 392

(Locklear).  The Government's attorney asked Locklear and Jacobs whether Mr.

Garcia-Lagunas needed an interpreter when he spoke to him.  J.A. 331 (Jacobs),

392 (Locklear).

*Marco Hernandez*

Hernandez testified that he lived in the trailer at 353 Wescott Drive.  J.A.

296.  He testified through an interpreter and said he does not understand English.

J.A. 291, 321.

Hernandez testified that Mr. Garcia-Lagunas had lived with him for three to

four weeks before the day of the arrest.  J.A. 297.  He said it was a mistake when

he told the police that he had another roommate who had moved out.  J.A. 297-98.

Hernandez testified that on the day the police came, he observed Jacobs

give Mr. Garcia-Lagunas money and a gun.  J.A. 298.  He also testified that he had

never seen Mr. Garcia-Lagunas deal drugs.  J.A. 306.

15

Hernandez agreed to let the police search the trailer and led them through it. J.A. 299, 301.  He identified "Alex's room" where the police found the crack, the scales, and the bullet proof vest. J.A. 301-02.  He testified that Mr. Garcia-Lagunas had brought the bullet proof vest to the trailer about two weeks before the police came to the trailer.  J.A. 302.  Hernandez testified pursuant to a plea agreement.  J.A. 304.

*The other police witnesses*

The Government presented testimony from five other police officers involved in the searches and/or the arrest of Mr. Garcia-Lagunas:  Gregory Johnson, Marco Gutierrez, Terry Sampson, Kurt Stein, and Pedro Orellano.

Johnson found what he called "cocaine wrappers" in the shed behind 47 Sonoma Street and opined they contained cocaine residue based on his observations and positive field test results.  J.A. 278-80.  Gutierrez assisted in interviewing Hernandez and found what he believed was crack in the jacket in the bedroom closet.  J.A. 403-04.  Taylor found the baggies in the kitchen of 353 Wescott Drive and opined that they are "mostly used for the repackaging and sale of narcotics."  J.A. 410-11.  Sampson found what he called powder cocaine and a small bag of crack cocaine in the plastic container in the bedroom of the trailer.

16

J.A. 415-16.  He agreed that lab test of the powder was negative for cocaine.  J.A.

421-22.  He said SBI lab testing confirmed that the small bag in the plastic

container and the small bag in the jacket pocket contained crack cocaine.  J.A.

420-21.  Stein likewise testified about the contents of the plastic container, stating

that narcotics traffickers use the kind of vacuum seal bag the police found.  J.A.

437-38.  Stein was not present for the searches at Sonoma Street, but he opined

that the plastic bags found in the shed contained cocaine.  J.A. 447-48.  He also

testified that phone numbers for Mr. Garcia-Lagunas's phone showed calls with

numbers associated with Reed and Brewington, as well as others Stein said were

known drug dealers.  J.A. 453-55.

Johnson testified that he spoke to Mr. Garcia-Lagunas in Spanish.  J.A. 284.

He observed Mr. Garcia-Lagunas speaking both Spanish and English and said he

believed Mr. Garcia-Lagunas had no difficulty communicating in English.  J.A.

285.  Gutierrez, Sampson, and Stein did not speak with Mr. Garcia-Lagunas.  J.A.

403, 414, 434.

Orellano, a native Spanish speaker, spoke with Hernandez and Mr. Garcia-

Lagunas in Spanish at 353 Wescott.  J.A. 103, 247-48.  Brian Jacobs did not speak

Spanish, so Orellano spoke to him in English.  J.A. 248.

17

At the scene, Hernandez told Orellano that he had a roommate who had stayed in the bedroom where the police found the crack, scales, and bulletproof vest, J.A. 265; he later told Orellano that Mr. Garcia-Lagunas had moved in a couple of days before the search, J.A. 267-68. Hernandez led Orellano through the trailer. J.A. 249-50.

Orellano opined that there was cocaine residue on the small digital scale found in the dresser drawer. J.A. 254-55. He also testified that the powder found inside the plastic container was compressed, consistent with packaging of cocaine for transportation and distribution. J.A. 256.

During cross-examination, Mr. Garcia-Lagunas's counsel got Orellano to authenticate a picture of a bedroom in the trailer at 33 Sonoma Street. J.A. 257-58. Orellano also confirmed that the trailer was surrounded by many abandoned vehicles. J.A. 260.

On redirect examination, the Assistant United States Attorney directed Orellano to his testimony about the living conditions at the Sonoma Street trailer and then asked whether Orellano had investigated "any other Hispanic drug trafficking operations." J.A. 270. Orellano said he had investigated "Hispanic drug trafficking organizations." J.A. 270. The Government's counsel then asked

what "Hispanic drug trafficking organizations" moving drugs into North Carolina do with the drug proceeds they receive.  J.A. 270.  Orellano responded:

> To my surprise, I learned that all the ones that I have dealt with, they're very modest living and they send the majority if not all of the proceeds back to their native countries.

J.A. 270.

When the Government's counsel started to ask a further question about "Hispanic drug trafficking organizations," Mr. Garcia-Lagunas's counsel objected. J.A. 271.  The Government's counsel argued he was addressing the testimony about the modest living conditions brought out on cross-examination and the implication "that it would be impossible for the defendant to have dealt with these large amounts of cocaine and taken in this large amount of money because he's living in relatively low level conditions."  J.A. 271.  The district court sustained the objection.  J.A. 272.

The Government's counsel persisted.  He asked Orellano whether there was evidence of Mr. Garcia-Lagunas living extravagantly, with fancy cars or expensive jewelry, and when Orellano said there was no such evidence, the Government's counsel asked whether Orellano whether he was surprised that Mr. Garcia-Lagunas did not have fancy cars or large amounts of money.  J.A. 272.  Orellano

19

answered that the evidence was "consistent with the method or operation by Hispanic drug traffickers" before Mr. Garcia-Lagunas's attorney lodged another objection. J.A. 272.

The court asked Orellano for the basis of his opinion. J.A. 272. Orellano said he based his opinion on training and experience "dealing with Hispanic drug traffickers." J.A. 272-73. The court noted: "I'm not quite sure what the relevance of all this is, but I do know, based on my experience, that most Latins send money home whether they're drug dealers or not." J.A. 273. The court thus allowed Orellano to testify that the absence of the trappings of an extravagant lifestyle was "consistent with Hispanic drug traffickers." J.A. 273, 274.

*The jury instructions and post-trial proceedings*

Before instructing the jury, the court expressed concern that the Government had not presented any evidence that Mr. Garcia-Lagunas had agreed to sell 500 grams or more of cocaine. J.A. 524. The court stated it was troubled by the inclusion of the 500 gram quantity in the Indictment when, in the court's view, there was never an agreement as to quantity. J.A. 525. The Government persuaded the court that the Indictment tracked the statutory language and that in order to trigger the statutory minimum, the Government had to charge the drug quantity in the Indictment. J.A. 525-27. The Government further explained they

20

had to show the drug quantity was reasonably foreseeable to the defendant. J.A. 529-30. The court decided to include the 500 gram quantity on the verdict form. J.A. 535.

After the trial, the court entered an order *sua sponte* that reflected the court's concern that a legal error occurred during trial that could affect Mr. Garcia-Lagunas's sentencing. J.A. 577-585. The court said it was concerned that the verdict sheet and jury instructions were erroneous in that the jury did not make any findings regarding the amount of cocaine individually attributable to Mr. Garcia-Lagunas. J.A. 578. The court directed the parties to brief the issue whether the court had erred under *United States v. Collins*, 415 F.3d 304 (4th Cir. 2005), and *United States v. Brooks*, 524 F.3d 549 (4th Cir. 2008). J.A. 584.

The parties submitted briefs on this issue. J.A. 586-605, 606-619, 621-29. The court ruled that no *Collins* error had occurred. J.A. 632-42.

*Sentencing*

The Probation Office found that Mr. Garcia-Lagunas was responsible for 16 grams of crack cocaine and 39,705.28 grams of cocaine, and established a base offense level of 34. J.A. 702, 706. The Probation Office added two levels for possession of a firearm, two levels for threats of violence, and two levels for obstruction of justice, yielding an adjusted offense level of 40. J.A. 707. The

21

illegal reentry conviction did not affect the offense level calculation.  J.A. 708.

Based on Mr. Garcia-Lagunas's criminal history category I, the Probation Office

determined his Guidelines sentencing range was 292-365 months.  J.A. 708.

At the sentencing hearing, the Government did not contest Mr. Garcia-

Lagunas's objections to the enhancements for threat of violence and obstruction of

justice.  J.A. 670-71.  Over Mr. Garcia-Laguna's objection, the court adopted the

Probation Office's drug quantity finding.  J.A. 671-73.  The court also overruled

an objection to the firearm enhancement.  J.A. 674.  Adjusting the offense level to

36, the court found that Mr. Garcia-Lagunas's Guidelines sentencing range was

188-235 months.  J.A. 674.  The Government's counsel then advised the court that

the Government would not oppose a two-level downward variance based on an

amendment to the Guidelines, and upon the stipulation of Mr. Garcia-Lagunas's

counsel that he would not move for a reduction in sentence based on the

Guidelines amendment, the court noted it would reduce the offense level by two

levels.  J.A. 678-80.

The court then recited its judgment:

The court finds the basis for the findings contained in the Presentence
Report credible and reliable and, therefore, the court adopts those
findings.  Based on those findings, the court has calculated the
imprisonment range prescribed by the advisory sentencing guidelines.
The court has considered that range as well as other relevant factors set
forth in the advisory sentencing guidelines and those set forth in 18

> United States Code section 3553(a). Pursuant to the Sentencing Reform
> Act of 1984, it is the judgment of the court that the defendant is hereby
> committed to the custody of the Bureau of Prisons to be imprisoned for
> a term of 188 months on Court One and a term of 24 months on Count
> Two to be served consecutively.

J.A. 680-81. The court noted it was sentencing Mr. Garcia-Lagunas at the low end

of the Guidelines range because this was Mr. Garcia-Lagunas's first felony

conviction. J.A. 683.

After conferring with the Probation Officer, the court asked Mr. Garcia-

Lagunas, "Do you have anything you want to say to the court before the court

imposes sentence?" J.A. 683, 684. After Mr. Garcia-Lagunas made a brief

statement, the court said, "The sentence stands as I've read it." J.A. 684.

When the court entered its written judgment, it noted that the advisory

Guidelines range was 188-235 months based on a total offense level of 36 and

Criminal History Category I. J.A. 694. The court's written judgment also stated

that it sentenced Mr. Garcia-Lagunas based on a two-level downward variance

pursuant to an anticipated Guidelines amendment recommended by the

Department of Justice. J.A. 695.

## SUMMARY OF ARGUMENT

The record below reveals a trial plagued by impermissible appeals to racial

prejudice. Mr. Garcia-Lagunas is a Mexican national. His race, or national origin,

was gratuitously injected into his trial on several occasions. The district court admitted race-based opinion testimony and allowed the Government to argue that the jury should draw an inference adverse to Mr. Garcia-Lagunas because of his race. J.A. 270-74, 520. Further, the court permitted the Government to elicit irrelevant testimony regarding Mr. Garcia-Lagunas's immigration status. J.A. 150. The Government attempted to impugn Mr. Garcia-Lagunas's character by repeatedly drawing the jury's attention to the fact that Mr. Garcia-Lagunas spoke some English, despite the fact that he was accompanied by a Spanish interpreter at trial. *See* J.A. 150-51.

The district court also erred by admitting improper lay opinion testimony and allowing the Government to present an expert witness while flouting the disclosure requirements of Rule 16 of the Federal Rules of Criminal Procedure.

As shown below, these errors denied Mr. Garcia-Lagunas a fair trial. Putting a criminal defendant's race on trial is repugnant to our Constitution. Therefore, Mr. Garcia-Lagunas respectfully requests that the Court reverse his conviction and allow him the benefit of a fair trial untainted by the specter of racial prejudice.

The district court also committed multiple errors in imposing Mr. Garcia-Lagunas's sentence. The court deprived Mr. Garcia-Lagunas of his right to

24

presentence allocution, miscalculated the applicable Guidelines range, failed to

apply the sentencing factors set forth in 18 U.S.C. § 3553(a) or to articulate the

basis for its sentence, and imposed a substantively unreasonable sentence.  For

these reasons, Mr. Garcia-Lagunas is entitled to vacatur and remand for

resentencing.

## ARGUMENT

I.    MR. GARCIA-LAGUNAS IS ENTITLED TO A NEW TRIAL WHERE
      THE GOVERNMENT'S RELIANCE ON RACE-BASED OPINION
      TESTIMONY TO PROVE CULPABLE CONDUCT DEPRIVED MR.
      GARCIA-LAGUNAS HIS DUE PROCESS AND EQUAL PROTECTION
      RIGHTS.

*Standard of Review*

"This Court reviews a district court's evidentiary ruling for abuse of

discretion."  *United States v. Johnson*, 617 F. 3d 286, 292 (4th Cir. 2010) (internal

quotations and citations omitted).  If the Court finds error, and the defendant

objected below, the Government bears the burden of proving that the error was

harmless beyond a reasonable doubt.  *United States v. Hedgepeth*, 418 F.3d 411,

419 (4th Cir. 2005).  Where the defendant failed to object to an evidentiary error

below, the defendant bears the burden of showing plain error.  *United States v.

Olano*, 507 U.S. 725, 731-36 (1993).

*Discussion*

> A.    The District Court Erroneously Admitted Evidence Of A Racial Stereotype And Argument Based On That Stereotype.

Courts uniformly recognize that race must not enter the calculus that leads to a criminal conviction.  *See, e.g.*, *United States v. Cabrera*, 222 F.3d 590, 597 (9th Cir. 2000); *United States v. Doe*, 903 F.2d 16, 21 (D.C. Cir. 2000); *United States v. Vue*, 13 F.3d 1206, 1213 (8th Cir. 1994); *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992); *United States v. Rodriguez-Cortes*, 949 F.2d 532, 543 (1st Cir. 1991).  The use of race or national origin to prove a criminal defendant's conduct offends the due process and equal protection guarantees of the Fifth Amendment.  *See United States v. Vue*, 13 F.3d at 1213.  Mr. Garcia-Lagunas was deprived of those constitutional guarantees when the district court admitted race-based opinion testimony and allowed the Government to argue that the jury should draw an inference adverse to Mr. Garcia-Lagunas based on a racial stereotype.  *See* J.A. 270-74, 520.

The district court admitted Detective Orellano's testimony that "Hispanic drug traffickers" tend to live modest lifestyles and send their drug proceeds "home."  J.A. 270.  Detective Orellano testified that he was not surprised that he did not find "the defendant with the trappings of an extravagant lifestyle" because that is "consistent with Hispanic drug traffickers."  J.A. 274.  At a bench

26

conference to address defense counsel's objection, the court noted its agreement with that racial stereotype, saying that in the court's experience, "most Latins send money home whether they're drug dealers or not." J.A. 273.

The Government asked the jury to draw an inference adverse to Mr. Garcia-Lagunas—that in spite of the absence of any evidence that Mr. Garcia-Lagunas accumulated wealth in the course of purportedly trafficking nearly 40 kilograms of cocaine, the jury should assume that he accumulated and disposed of the proceeds of the drug trade by sending them to his "home country." J.A. 520. That inference was based on a single fact: Mr. Garcia-Laguna's race. *See* J.A. 520. Further confirming that it was relying on race as a proxy for conduct, the Government argued that Mr. Garcia-Lagunas's race was the reason "we don't have an extravagant lifestyle associated with the defendant," in contrast to the lifestyle of Government witness Ronnie Reed, a non-Hispanic drug dealer. J.A. 520.

The district court erred by allowing Detective Orellano to testify to a racial stereotype about "Hispanic drug traffickers." *See United States v. Cabrera*, 222 F.3d at 596 (error to admit testimony regarding habits of "Cuban drug dealers"); *United States v. Doe*, 903 F.2d at 18 (error to admit evidence of modus operandi of "Jamaican drug dealers"). The court compounded its error by allowing the Government to argue that "evidence" to the jury. *See United States v. Rodriguez-*

27

*Cortes*, 949 F.2d at 543 (error to admit the defendant's Colombian identification card and allow prosecutor to argue for an inference adverse to the defendant based on his national origin).

B.    The District Court's Errors In Allowing Race-Based Evidence And Argument Warrant Reversal.

Because Mr. Garcia-Lagunas objected to Detective Orellano's testimony regarding "Hispanic drug traffickers," the Government may avoid reversal only by showing that the error was harmless beyond a reasonable doubt. *See United States v. Hedgepeth*, 418 F.3d at 419.  The Government's improper argument based on that racial stereotype is subject to plain error review.  *See United States v. Olano*, 507 U.S. at 736.  The Court may correct a plain error affecting Mr. Garcia-Lagunas's substantial rights where the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  *See id.*  Regardless of the standard applied, reversal is warranted on these facts because the district court's errors resulted in a trial infected by racial prejudice.  *See, e.g.*, *United States v. Rodriguez-Cortes*, 949 F.2d at 543 (harmless error); *United States v. Doe*, 903 F.2d at 26 (plain error).

The Supreme Court has consistently recognized that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice."  *Rose v. Mitchell*, 443 U.S. 545, 555 (1979); *accord*

28

*Powers v. Ohio*, 499 U.S. 400, 415 (1991) (condemning prosecutor's exercise of race-based peremptory challenges); *Batson v. Kentucky*, 476 U.S. 79, 87-88 (1986) (same). Further, "public respect for our system of justice is undermined when the system discriminates based on race." *Johnson v. California*, 543 U.S. 499, 511 (2005). "Because of the risk that the factor of race many enter the criminal justice process, [the Court] ha[s] engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system." *McCleskey v. Kemp*, 481 U.S. 279, 309 (1987) (quoting *Batson*, 476 U.S. at 85)).

Given these concerns, courts have not hesitated to find reversible error under either a harmless or plain error standard when there is any risk that racial prejudice contributed to a criminal conviction. *See, e.g.*, *United States v. Doe*, 903 F.2d at 21 ("It is much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case."); *McFarland v. Smith*, 611 F.2d 414, 419 (2d Cir. 1979) ("The evils of racial prejudice lurk too frequently throughout the administration of criminal justice. They must be condemned whenever they appear."). Even in civil cases, courts have recognized that evidence of racial and ethnic stereotypes is so prejudicial as to warrant reversal. *See Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1009 (9th Cir.), *amended on unrelated grounds*, 272 F.3d 1289 (9th Cir. 2001); *see also Rush v. Smith*, 56

F.3d 918 (8th Cir. 1995) (holding district court's comment, in civil case, that "the races have a tendency to stick together" was plain error).

"Injection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudicial for reasons that need no elaboration here." *United States v. Cruz*, 981 F.2d at 664.  Contrary to the Government's argument to the jury, race is not a proxy for conduct or character. *See, e.g.*, *Johnson*, 543 U.S. at 511 ("When government officials are permitted to use race as a proxy for gang membership and violence without demonstrating a compelling government interest and proving that their means are narrowly tailored, society as a whole suffers."); *Powers*, 499 U.S. at 410 ("Race cannot be a proxy for determining juror bias or competence.").  The Government's request that the jury misuse race as a proxy for conduct created an intolerable risk that racial prejudice infected Mr. Garcia-Lagunas's conviction.  *See Miller v. North Carolina*, 583 F.2d 701, 707-08 (4th Cir. 1978) (reversing rape convictions where prosecutor "resort[ed] to racial prejudice" to overcome consent defense although defense "admittedly was not a strong one"); *see also McFarland*, 611 F.2d at 419 (reversing where prosecutor argued that black officer was more likely to be truthful because he was testifying against a black defendant).

Where a district court admits evidence that can be "used as the basis for

30

making generalizations" based on race or ethnicity,"the harmfulness of the error is obvious." *United States v. Rodriguez-Cortes*, 949 F.2d at 542-43.  In *Rodriguez-Cortes*, the district court admitted the defendant's Colombian identification card into evidence on the ground that "a Colombian is more likely to trust another Colombian." *Id.* at 541.  The First Circuit reversed, noting that "everything that both attorneys did from the moment the judge ruled was necessarily colored by their knowledge of the judge's improper reason." *Id.* at 543.  Here, the district court allowed Detective Orellano's testimony, reasoning that "based on [the court's] experience, that most Latins send money home whether they're drug dealers or not." J.A. 273.  The district court's express approval of a race-based stereotype "colored the subsequent proceedings," enhancing the risk of prejudice. *See United States v. Rodriguez-Cortes*, 949 F.2d at 543.

Further, the Government used a racial stereotype to explain a key shortcoming in its case—the absence of any evidence that Mr. Garcia-Lagunas accumulated wealth, despite the fact that he was accused of trafficking nearly 40 kilograms of cocaine.  J.A. 270, 520.  This Court has recognized the probative value of evidence of a defendant's unexplained wealth to create an inference of participation in narcotics trafficking.  *See United States v. Grandison*, 783 F.2d 1152, 1156 (4th Cir. 1986) ("It is clear that evidence of unexplained wealth is

31

relevant in a narcotics prosecution as evidence of illegal dealings and ill-gotten gains."); *United States v. Poindexter*, No. 95-5327, 1997 WL 577679, at *5 (4th Cir. Sept. 18, 1997) (unpublished) (evidence defendant purchased car while unemployed "was admissible in this drug trafficking prosecution as evidence of unexplained wealth").  On these facts, where Mr. Garcia-Lagunas was a known cocaine user, there was no physical evidence of the cocaine Mr. Garcia-Lagunas was charged with conspiring to distribute, and the Government's case depended on the testimony of a series of drug dealers testifying pursuant to plea agreements, the presence or absence of unexplained wealth was especially significant.  *See* J.A. 168, 283-84, 349; J.A. 421; J.A. 210-11, 304, 343, 367, 393.

The closing arguments reveal that both parties agreed the presence or absence of drug proceeds was significant.  Defense counsel pointed out in closing that there was no evidence of drug proceeds.  J.A. 510.  The Government then emphasized Detective Orellano's testimony about "Hispanic drug trafficking organizations" in its final opportunity to address the jury.  J.A. 520.  In rebuttal, the Government relied on that racial stereotype to argue that Mr. Garcia-Lagunas must have sent his drug proceeds to his "home country."  J.A. 520.

Finally, "[t]he fairness and integrity of criminal trials are at stake if we allow police officers to make generalizations about racial and ethnic groups in

32

order to obtain convictions." *United States v. Cabrera*, 222 F.3d at 597 (reversing for plain error where court admitted testimony regarding "Cuban drug dealers"). Admission of evidence that allows the jury to consider a defendant's race in reaching a verdict is "a serious trespass on the rights to due process and equal protection." *United States v. Vue*, 13 F.3d at 1213. Reversal is therefore necessary to ensure Mr. Garcia-Lagunas's due process and equal protection rights to a fair trial. *See United States v. Cabrera*, 222 F.3d at 597; *United States v. Vue*, 13 F.3d at 1213 (reversing under harmless error standard); *United States v. Cruz*, 981 F.2d at 664; *United States v. Doe*, 903 F.2d at 28 (reversing for plain error).

II.    THE DISTRICT COURT ERRED BY ADMITTING EVIDENCE THAT IMPUGNED MR. GARCIA-LAGUNAS'S CHARACTER BASED ON HIS IMMIGRATION STATUS AND HIS USE OF A SPANISH INTERPRETER AT TRIAL.

*Standard of Review*

Where the defendant did not object to evidence admitted by the district court, this Court reviews for plain error. *See United States v. Olano*, 507 U.S. at 731-36.

*Discussion*

"An appeal to racial prejudice impugns the concept of equal protection of the laws." *Miller v. North Carolina*, 583 F.2d at 707; *see United States v. Odom*, 736 F.2d 104, 118 (4th Cir. 1984) (noting the "uniquely prejudicial character" of

33

appeals to racial prejudice). Evidence that a party is an "illegal alien" reflects an improper appeal to prejudice and bias based on national origin. *See Rojas v. Richardson*, 703 F.2d 186, 191 (5th Cir.), *rev'd en banc*, 713 F.2d 116 (5th Cir. 1983) (agreeing with panel that reference to "illegal alien" was "highly prejudicial and a blatant appeal to jury bias").

A criminal defendant who lacks an understanding of English has a due process right to the aid of an interpreter to be able to understand what is said at trial and to communicate with his counsel. *E.g.*, *Mendoza v. United States*, 755 F.3d 821, 827-28 (7th Cir. 2014). The Court Interpreters Act ensures this right is protected. *See* 28 U.S.C. § 1827.

Consistent with the strategy reflected in its reliance on testimony of a racial stereotype about "Hispanic drug traffickers," the Government intentionally injected additional prejudicial evidence of Mr. Garcia-Lagunas's national origin into the trial to impugn his character. Beginning with its first witness, Shawn Collins, the Government elicited testimony at the end of Collins's direct examination that Mr. Garcia-Lagunas was present in the United States illegally. JA. 150. Although the Government forecasted it would offer evidence of Mr. Garcia-Lagunas's immigration status as Rule 404(b) evidence, J.A. 34-35, Collins's testimony that Mr. Garcia-Lagunas was present in this country illegally

34

was not relevant or necessary, but rather was abject bad character evidence. *See United States v. Williams*, 740 F.3d 308, 314 (4th Cir. 2014) (prior bad acts evidence is admissible under Rule 404(b) if relevant to an issue, not offered to establish defendant's general character, and necessary as probative of essential claim or element); *United States v. McBride*, 676 F.3d 385, 400 (4th Cir. 2012) (admission of bad acts evidence not harmless error); *United States v. Johnson*, 617 F.3d 286, 298 (4th Cir. 2010) (same).

The Government also used Collins and other witnesses to impugn Mr. Garcia-Lagunas's character by attacking his use of a Spanish language interpreter. Mr. Garcia-Lagunas speaks Spanish.  J.A. 247-48, 284.  The district court determined he was entitled to an interpreter. *See* J.A. 7, 8, 11-12.  The Government's attorney directed Collins to Mr. Garcia-Lagunas's use of an interpreter immediately after eliciting Collins's testimony that Mr. Garcia-Lagunas was present in the United States illegally.  J.A. 150.  The Government's evident purpose was to assail Mr. Garcia-Lagunas as a Spanish-speaking "illegal alien." Furthering the attack on Mr. Garcia-Lagunas's character, the Government's attorney elicited Collins's testimony that he had not needed an interpreter when he spoke to Mr. Garcia-Lagunas in English, and the Government elicited similar testimony from Jacobs and Locklear.  J.A. 151, 331, 392.  The Government thus

35

sought to brand Mr. Garcia-Lagunas as a faker who did not need an interpreter; the Government reinforced this character attack by having all of the drug dealers testify that they spoke to Mr. Garcia-Lagunas in English, and having three witnesses testify that Mr. Garcia-Lagunas appeared to have no difficulty understanding English.  J.A. 239, 285, 331, 370, 391, 392.  Admitting this prejudicial evidence was plain error.

III.  THE DISTRICT COURT ERRED BY PERMITTING SPECIAL AGENT COLLINS TO TESTIFY AS AN EXPERT WITNESS WHERE THE GOVERNMENT FAILED TO COMPLY WITH THE EXPERT DISCLOSURE REQUIREMENTS.

*Standard of Review*

Where the defendant did not object to the Government's failure to comply with the expert disclosure requirements mandated by the Federal Rules of Criminal Procedure, this Court reviews for plain error.  *See United States v. Olano*, 507 U.S. at 731-36.

*Discussion*

Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure provides that "[a]t the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, and 705 of the Federal Rules of Evidence during its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(G).  The summary "must describe the witness's opinions,

36

the bases and reasons for those opinions, and the witness's qualifications." *Id.* Where a party fails to comply with the expert disclosure requirements, the district court may: "(A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2).

The expert disclosure provisions of Rule 16 are "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment. As the Advisory Committee has noted, the requirement that the Government provide a summary of the bases for an expert's opinion is "perhaps [the] most important" requirement in the rule. *Id.* The summary "should cover not only written and oral reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts." *Id.* Although an expert witness may be qualified on the basis of experience, "[i]f the witness is relying solely or primarily on experience, then the

37

witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

The Government's notice of expert testimony provided none of the information required by Rule 16.  J.A. 31-32.  The Government's notice for its one expert who testified at trial, Shawn Collins, stated as follows:

> Shawn Collins is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.  He will testify about drug trafficking investigations and methods utilized by drug traffickers to operate and protect their drug business.

J.A. 31-32.  The notice did not state Collins's qualifications, did not state his opinions, and did not state the bases and reasons for his opinions.  *See* Fed. R. Crim. P. 16(a)(1)(G).

The district court's plain error in permitting Collins to testify as an expert witness affected Mr. Garcia-Lagunas's substantial rights and seriously affected the fairness of the trial.  *See United States v. Olano*, 507 U.S. at 731-36.  Although Rule 16 gives the district court discretion in responding to a disclosure violation, each of the remedial options recognizes that fairness requires that a party have the right to respond effectively to expert evidence.  *See* Fed. R. Crim. P. 16(d)(2).

38

As this Court has noted, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty of evaluating it." *United States v. Dorsey*, 45 F.3d 809, 815-16 (4th Cir. 1995) (*quoting Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (citation in *Daubert* omitted)). Collins was the Government's most important witness—he was the first witness, testified longer than any other witness, and previewed the Government's entire case. J.A. 80-185. Collins's expert testimony was completely unexpected, because the Government provided no notice of his opinions or the bases and reasons for his opinions, thus frustrating a central purpose of the disclosure rule. *See* Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment. Mr. Garcia-Lagunas's attorney had no chance to prepare cross-examination for Collins, unfairly hindering his ability to test Collins's testimony. *See id.* The district court's plain error warrants reversal and remand for a new trial.

IV.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY ALLOWING IMPROPER OPINION TESTIMONY FROM FOUR GOVERNMENT WITNESSES.

*Standard of Review*

Evidentiary errors are reviewed for abuse of discretion. *United States v. Johnson*, 617 F. 3d at 292. Where the defendant objected below, the Government bears the burden of proving harmlessness *United States v. Hedgepeth*, 418 F.3d at

39

419.  Where the defendant failed to object, the defendant bears the burden of showing plain error.  *United States v. Olano*, 507 U.S. at 731-36.

*Discussion*

"Rule 701 forbids the admission of expert testimony dressed in lay witness clothing."  *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010) (internal quotation omitted).  A lay witness may give opinion testimony only if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  A district court thus abuses its discretion when it permits a lay witness to opine based on her training and experience rather than her own perception.  *See United States v. Johnson*, 617 F.3d at 292-93; *see also United States v. Stacks*, 571 F. App'x 164, 168, 171 (4th Cir. 2014) (holding district court erred by permitting lay witness to testify "from his experience as a law enforcement officer" about slang terms for firearms); *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203-04 (4th Cir. 2000) (vacating and remanding for new trial where district court improperly permitted lay witness to give expert testimony based on his knowledge and experience).

40

A.    The District Court Erred By Allowing Four Law Enforcement
      Officers To Give Opinions Based On Their Training and Experience.

The district court erroneously allowed four Government witnesses to testify

to purported lay opinions based on their training and experience.  *See* J.A. 109-11,

252, 254-55, 270-74, 411, 437-38, 448.

First, the Government elicited testimony from Collins, over Mr. Garcia-

Lagunas's objection, that a vacuum seal bag containing 800 grams of white

powder that was determined not be to cocaine might have tested negative for the

presence of a controlled substance because of the amount of cutting agent added to

what was purportedly cocaine.  J.A. 109-11.  Defense counsel objected that Agent

Collins was not qualified as an expert in State Bureau of Investigation laboratory

techniques or in chemical analysis.  J.A. 109.  The court initially sustained, but

then overruled the objection when the Government offered to lay a foundation to

show that Agent Collins's opinions were based on his experience as an

investigator.  J.A. 109-10.  Agent Collins then testified that the test results came

back negative because "when the lab sampled a small amount of that 800 grams of

cocaine there, in my opinion, wasn't enough cocaine in it to even register with the

SBI or the instruments they were using."  J.A. 111.

Although Agent Collins was offered as an expert "in the field of narcotics

investigations," nothing in the record suggests that he was qualified to opine on

41

the reasons for the outcome of the SBI lab's tests. J.A. 82. Therefore, he could only have opined on that subject as a lay witness. However, the testimony the Government elicited following defense counsel's objection reveals that Agent Collins's opinions were not based on his perception. J.A. 109-110; *see United States v. Johnson*, 617 F.3d at 293 ("In response to the defense's objection, the government elicited testimony on Smith's credentials and training, not his observations from the surveillance employed in this case."). Agent Collins testified that his opinion was based on his experience with the SBI lab, and on his conversations with the lab. *See* J.A. 110-11. "His post-hoc assessments cannot be credited as a substitute for the personal knowledge and perception required under Rule 701." *United States v. Johnson*, 617 F.3d at 293. Because Agent Collins's testimony was not admissible as either expert or lay opinion, the district court erred by overruling Mr. Garcia-Lagunas's objection. *See* J.A. 109-10.

Second, the Government elicited opinion testimony from three witness who were not tendered as experts: (1) Detective Orellano; (2) Detective Taylor; and (3) Detective Stein. J.A. 270-74, 411. Detective Orellano testified, over defense counsel's objection, to his opinion about the typical conduct of "Hispanic drug traffickers," and explained that his opinion was based on his training and experience. J.A. 272-73. Detective Taylor testified that based on his training and

42

experience as a narcotics detective, bags of the type found in the kitchen where

Mr. Garcia-Lagunas was arrested were "mostly used for the repackaging and sale

of narcotics." J.A. 411. Detective Stein testified that, based on his training and

experience, drug users or traffickers used the type of vacuum seal bag recovered

from the home where Mr. Garcia-Lagunas was arrested to avoid detection. J.A.

437-38, 448.

B.    The Improper Opinion Testimony Was Prejudicial.

Because Mr. Garcia-Lagunas objected to the improper lay opinion testimony

of Agent Collins and Detective Orellano, the Government must show that the

admission of that testimony was harmless beyond a reasonable doubt. *United*

*States v. Hedgepeth*, 418 F.3d at 419. Detectives Taylor and Stein offered

opinions without objection; the district court's erroneous admission of their

opinion testimony is subject to plain error review. *United States v. Olano*, 507

U.S. at 731-36.

On harmless error review, the question is not whether there was sufficient

evidence to support the result. *Kotteakos v. United States*, 328 U.S. 750, 765

(1946). "It is rather, even so, whether the error itself had substantial influence."

*Id.* The prejudicial impact of Detective Orellano's testimony is discussed *supra* at

section I.B. Agent Collins's testimony regarding the SBI lab results addressed a

43

critical gap in the Government's case—the absence of physical evidence of cocaine. The only physical evidence arguably linking Mr. Garcia-Lagunas to illegal drugs was a user amount of crack. J.A. 417, 420-21. The Government did not recover any cocaine, the substance charged in the indictment. J.A. 421. Therefore, the Government depended on the testimony of a series of purported co-conspirators to make its case against Mr. Garcia-Lagunas. *See* J.A. 201-40, 291-402. Each of those witnesses testified in exchange for the prospect of a lesser sentence. J.A. 211-12, 304-05, 344, 368, 400. Their testimony was thus inherently suspect. Although the jury was entitled to credit the testimony of the co-conspirators, the testimony "required searching scrutiny." *See United States v. Garcia*, 752 F.3d 382, 397 (4th Cir. 2014) (holding admission of improper opinion testimony not harmless where, among other things, key government witness testified in exchange for sentencing considerations).

Given the lack of physical evidence and the Government's complete reliance on co-conspirator testimony to connect Mr. Garcia-Lagunas to any amount of cocaine, the Government cannot show that Agent Collins's speculation that in spite of the SBI lab results, there was physical evidence of cocaine, is harmless beyond a reasonable doubt. *See id.* Therefore, the admission of Agent Collins's testimony on that subject is reversible error.

44

V.    UNDER THE CUMULATIVE ERROR DOCTRINE, THE DISTRICT
      COURT'S MULTIPLE EVIDENTIARY ERRORS, CONSIDERED IN
      THE AGGREGATE, DENIED MR. GARCIA-LAGUNAS A FAIR TRIAL.

"[E]rroneous evidentiary rulings can, in combination, rise to the level of a due process violation." *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996). "Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Lighty*, 616 F.3d 321, 371 (4th Cir. 2010). A defendant is entitled to relief under the cumulative error doctrine when errors "so fatally infect the trial that they violated the trial's fundamental fairness." *Id.* Where a defendant has the burden to prove plain error, he may meet his burden by showing that two or more errors, considered together, affected a substantial right. *See United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002).

As shown above, the district court made numerous evidentiary errors. Even if this Court concludes that none of these errors, in isolation, is sufficiently prejudicial to warrant reversal, Mr. Garcia-Lagunas respectfully contends that the cumulative effect of the evidentiary errors denied him the fair trial guaranteed by the Due Process Clause. *See Egelhoff*, 518 U.S. at 53. Therefore, Mr. Garcia-Lagunas is entitled to reversal of his conviction and a new trial.

VI.   MR. GARCIA-LAGUNAS IS ENTITLED TO A NEW SENTENCING
      HEARING BASED ON THE DISTRICT COURT'S MULTIPLE ERRORS.

      A.    The District Court Denied Mr. Garcia-Lagunas The Opportunity To
            Address The Court Before His Sentence Was Imposed.

*Standard of Review*

Before imposing a sentence, a district court must "address the defendant

personally in order to permit the defendant to speak or present any information to

mitigate the sentence."  Fed. R. Crim. P. 32(i)(4)(A)(ii).  "The rule is not satisfied

by merely affording the Defendant's counsel the opportunity to speak."  *United*

*States v. Cole*, 27 F.3d 996, 998 (4th Cir. 1994) (internal quotation and alterations

omitted); *see Green v. United States*, 365 U.S. 301, 304 (1961) ("The most

persuasive counsel may not be able to speak for a defendant as the defendant

might, with halting eloquence, speak for himself.").  Where, as here, a defendant

who is denied the right to presentence allocution does not object, this Court

reviews for plain error.  *United States v. Cole*, 27 F.3d at 998.  Under a plain error

standard, this Court has found reversible error when there are "grounds upon

which the court might have imposed a reduced sentence."  *Id.* at 999; *accord*

*United States v. Muhammad*, 478 F.3d 247, 250-51 (4th Cir. 2007) (vacating

although record "cast[] some doubt on whether Muhammad could have persuaded

the district court to impose a lesser sentence").

*Discussion*

The district court plainly erred by inviting Mr. Garcia-Lagunas to speak only after the court announced its sentence. J.A. 680-81, 684. Once Mr. Garcia-Lagunas addressed the court, the court reaffirmed its sentence without further elaboration. J.A. 684. Here, as in *Cole*, the drug quantity attributable to Mr. Garcia-Lagunas was in dispute. *See* 27 F.3d at 999. Mr. Garcia-Lagunas's base offense level depended on the district court's resolution of that dispute. *See* U.S.S.G. § 2D1.1(c) (drug quantity table). When Mr. Garcia-Lagunas did address the court, he argued that there was insufficient evidence of the drug quantity even to support his conviction. J.A. 684. If Mr. Garcia-Lagunas had been allowed to exercise his right to address the court before the sentence was imposed, the court could have been persuaded that Mr. Garcia-Lagunas was accountable for less than the 39.7 kilograms of cocaine and 16 grams of crack attributed to him. *See* J.A. 707; *United States v. Cole*, 27 F.3d at 999 (vacating under plain error standard where defendant could have persuaded court that he was accountable for lesser drug quantity). Because a lesser sentence was possible, the "fairness and integrity of the court proceedings would be brought into serious disrepute were [the Court] to allow the sentence to stand." *United States v. Cole*, 27 F.3d at 999. Therefore, Mr. Garcia-Lagunas is entitled to remand for resentencing. *See id.*

47

B.     Mr. Garcia-Lagunas's Sentence Is Procedurally And Substantively Unreasonable.

*Standard of Review*

This Court reviews a sentence for reasonableness. *United States v. Lynn*, 592 F.3d 572, 575 (4th Cir. 2010). The Court "must first ensure that the district court committed no significant procedural error . . . . Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 51 (2007).

*Discussion*

The district court procedurally erred by miscalculating the Guidelines range and failing to "make an individualized assessment based on the facts presented." *See id.* at 50. The Court need not reach substantive reasonableness to vacate and remand for resentencing. *See United States v. Carter*, 564 F.3d 325, 326-27 (4th Cir. 2009). Even so, an application of the § 3553(a) factors demonstrates that Mr. Garcia-Lagunas's sentence is substantively unreasonable.

1.     Mr. Garcia-Lagunas's Sentence Is Procedurally Unreasonable.

A district court commits procedural error when it miscalculates the applicable Guidelines range, "fail[s] to consider the § 3553(a) factors," or "fail[s] to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. at 51.

48

An individualized assessment is required even for a within-Guidelines sentence. *Id.* at 50. The district court erred by using an offense level of 36 to calculate the Guidelines range despite expressing its intention to vary downward two levels. J.A. 674, 680, 694. Further, the court failed to consider the § 3553(a) factors or "state any particularized basis to support its chosen sentence." *See United States v. Carter*, 564 F.3d at 326. Therefore, this Court "cannot uphold the sentence as procedurally reasonable or determine its substantive reasonableness." *Id.*

　　　　　　　　a.　　The district court used an incorrect Guidelines range.

　　The district court erred by miscalculating the Guidelines range. The Probation Office calculated a total offense level of 40. J.A. 708. Mr. Garcia-Lagunas objected to three two-level enhancements included in the presentence report. J.A. 663-65. The parties agreed that two of the enhancements did not apply. J.A. 670-71. The district court overruled Mr. Garcia-Lagunas's objection to a third enhancement and calculated an offense level of 36, yielding a Guidelines range of 188 to 235 months for Criminal History Category I. J.A. 674. When the Government advised the court that it would not oppose a two-level downward variance based on upcoming amendments to the drug quantity Guidelines, the court stated that it was "going to go down the two levels." J.A. 678, 680. The court then sentenced Mr. Garcia-Lagunas to 188 months' imprisonment. J.A. 681.

49

The variance to an offense level of 34 would have yielded a Guidelines range of 151 to 188 months. U.S.S.G. ch. 5, pt. A (sentencing table). Although 188 months is within that range, the record makes clear that the district court sentenced Mr. Garcia-Lagunas using the higher range of 188 to 235 months. The court did not recalculate the Guidelines range after it announced that it was varying downward. *See* J.A. 680. The court characterized its sentence as "at the low end of the range," when 188 months would have been the highest Guidelines sentence for the correct range. J.A. 683. In its Statement of Reasons, the court noted that it "used anticipated guideline amendments for establishing the respective drug weight," but then stated that the total offense level was 36, not 34. J.A. 694-95. Because his sentence depends on a incorrect calculation of the Guidelines range, Mr. Garcia-Lagunas is entitled to remand for resentencing. *See United States v. Montes-Flores*, 736 F.3d 357, 370-71 (4th Cir. 2013).

b.    The district court failed to consider the § 3553(a) factors.

The district court further erred when it neglected to analyze the § 3553(a) factors and make an individualized assessment of the facts. Although Mr. Garcia-Lagunas's counsel argued that the § 3553(a) factors warranted a below-Guidelines sentence of 60 months, the court did not address those factors or explain why it rejected the proposed sentence. *See* J.A. 652-59, 674-80. The district court

50

simply asserted that it "considered that [Guidelines] range as well as other relevant factors set forth in the advisory sentencing Guidelines and those set forth in 18 United States Code section 3553(a)." J.A. 680.

This Court has found procedural unreasonableness in similar circumstances. In *Carter*, the Court vacated the defendant's sentence where the district court stated "'that it was telling the reviewing body that [it was] looking at the four purposes in § 3553(a)(2),' and then summarized those four purposes," but did not explain how they applied to the defendant. 564 F.3d at 329 (alteration in *Carter*). The district court also stated "that it was 'deliberating on and integrating the seven factors that the reviewing court wants to know that the trial court used and considered,'" but did not apply those factors. *Id.* In *United States v. Gaskill*, 318 F. App'x 251 (4th Cir. 2009), this Court vacated the defendant's sentence where the district court did not address the § 3553(a) factors, despite the fact that both parties argued those factors. *Id.* at 258-59. Here, the district court likewise failed to address Mr. Garcia-Lagunas's arguments regarding any of the § 3553(a) factors. J.A. 674-80. Because the court's generic assertion that it did consider those factors is insufficient to support the sentence imposed, Mr. Garcia-Lagunas is entitled to a new sentencing hearing. J.A. 680; *see United States v. Carter*, 564 F.3d at 328-29; *Gaskill*, 318 F. App'x at 258-59.

51

2.    Mr. Garcia-Lagunas's Sentence Is Substantively Unreasonable.

Although the Court need not reach this question, Mr. Garcia-Lagunas respectfully contends that his sentence is substantively unreasonable. If the Court concludes that the sentence is within the correct Guidelines range, it "may, but is not required to, apply a presumption of reasonableness." *Gall v. United States*, 552 U.S. at 51. A defendant can rebut that presumption "by demonstrating that a sentence is unreasonable when measured against the § 3553(a) factors." *United States v. Montes-Pineda*, 445 F.3d 375, 379 (4th Cir. 2006).

An application of the § 3553(a) factors shows that Mr. Garcia-Lagunas's sentence is "greater than necessary" to comply with the purposes of sentencing. *See* 18 U.S.C. § 3553(a). Mr. Garcia-Lagunas has no scorable criminal history and had never been incarcerated before he was arrested for the offense at issue. J.A. 676, 703. A lengthy sentence is thus unnecessary to ensure "adequate deterrence." 18 U.S.C. § 3553(a)(2)(B); *see United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (noting fact "that a prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned" was relevant to § 3553(a) analysis). Because Mr. Garcia-Lagunas will be deported upon release, a shorter sentence will equally protect the public from any risk of further crimes. *See* 18 U.S.C. § 3553(a)(2)(C); J.A. 682. Finally, Mr. Garcia-Lagunas's co-defendants,

52

Brian Jacobs and Marco Hernandez, were sentenced to 60 months and 14 months, respectively. J.A. 700. Imposing a lesser sentence on Mr. Garcia-Lagunas would avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). Where the district court imposed a substantively unreasonable sentence, Mr. Garcia-Lagunas is entitled to remand for resentencing. *See United States v. Engle*, 592 F.3d 495, 505 (4th Cir. 2010).

      C.    The District Court Committed A *Collins* Error By Failing To Ask The Jury To Find The Drug Quantity Attributable to Mr. Garcia-Lagunas.

"Section 841(b) of Title 21 sets forth a graduated penalty scheme based on the quantity of drugs attributable to the defendant." *United States v. Foster*, 507 F.3d 233, 250 (4th Cir. 2007). In *United States v. Collins*, 415 F.3d 304 (4th Cir. 2005), this Court held that where a defendant is charged with a conspiracy to violate § 841, the district court must instruct the jury to apply *Pinkerton* principles to find the drug quantity attributable to each individual participant in the conspiracy. *Id.* at 314; *accord United States v. Brooks*, 524 F.3d 549, 558 (4th Cir. 2008). "In other words, for the statutory maximums and mandatory minimums of § 841(b) to apply in a drug conspiracy case, the jury must determine that the threshold drug amount was reasonably foreseeable to the individual defendant." *Foster*, 507 F.3d at 250-51. Here, the district court erred by failing to give a *Collins* instruction.

53

Mr. Garcia-Lagunas, along with his co-defendant Brian Jacobs, was charged with conspiracy to distribute 500 grams or more of cocaine.  J.A. 23.  According to the Indictment, Mr. Garcia-Lagunas and Mr. Jacobs conspired with "others known and unknown to the Grand Jury."  J.A. 23.  However, the district court did not give a *Collins* instruction at trial.  *See* J.A. 553-59.  Instead, the district court permitted the jury to find Mr. Garcia-Lagunas guilty of conspiracy without finding that he was accountable for any particular drug quantity.  *See Collins*, 415 F.3d at 314.  Because the district court committed a *Collins* error, Mr. Garcia-Lagunas could only be sentenced under the default statutory range for violation of 21 U.S.C. § 841(a), rather than the enhanced statutory range.  *Compare id.* § 841(b)(1)(B) *with id.* § 841(b)(1)(C).  The district court erred by finding that Mr. Garcia-Lagunas was subject to the enhanced penalty.  *See* J.A. 685 (noting application of § 841(b)(1)(B)).

## CONCLUSION

For the foregoing reasons, Alejandro Garcia-Lagunas respectfully requests that the Court reverse his conviction and remand for a new trial, or in the alternative, for resentencing.

This the 17th day of November, 2014.

 /s/ Paul K. Sun, Jr.
Paul K. Sun, Jr.
N.C. State Bar No. 16847
Attorney for Appellant Alejandro Garcia-Lagunas
ELLIS & WINTERS LLP
Post Office Box 33550
Raleigh, North Carolina  27636
Telephone:  (919) 865-7000
Facsimile: (919) 865-7010

55

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

A.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

this brief contains less than 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

B.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportionally spaced typeface using 14 Point Times New Roman in WordPerfect 9.

<u>/s/ Paul K. Sun, Jr.</u>
Attorney for Appellant Alejandro Garcia-Lagunas
Dated: 17 November 2014

56

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on 17 November 2014, I filed the

foregoing Brief with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to the following registered CM/ECF users:

Jennifer P. May-Parker, Esq., jennifer.may-parker@usdoj.gov.

This the 17th day of November, 2014.

/s/ Paul K. Sun, Jr.
Paul K. Sun, Jr.

57